Chief Justice Robertson
delivered the Opinion of the Court:
In February, 1794 — during the pendency of an appeal 'in this Court, prosecuted by Edward Mills, for reversing a decree dismissing a bill filed by him against Arthur Fox, for a relinquishment of the legal title to about fifteen hundred acres of land, included within Fox’s elder, patent of 1788, for twenty seven hundred acres, and by his own junior grant, of 1790, for two thousand acres,, he insisting that his entry was superior to that of Fox — ■ they compromised the suit, and adjusted their conflicting claims by agreeing on a line, dividing between them,, in nearly equal quantities, the land claimed by both, and. covenanting that each would convey to the other, by deed of quit claim, all his interest in the part allotted to him by the division.
Afterwards, in the same year, after Fox had put Mills- *172 in possession of the land thus conceded to him, but before either had executed a conveyance to the other, Fox died, leaving a widow and four infant children, and a will devising to his son Arthur the-tract of twenty seven hundred acres, “ excluding the lands given up to Mills, and forty acres sold to Washburn.”
In 1808, Henry Lee, who was Fox’s executor-, had intermarried with his widow, and was the guardian of his children, and Richard Graham, the husband of one of them, bought, for the sum of four hundred dollars, the interest of the trustees of Graham’s father in about fourteen thousand acres of land, which-had been, but-a short time before, granted to them, on an entry said to have been previously withdrawn and elsewhere appropriated. As this patent covered both Mills’ two thousand and Fox’s twenty seven hundred acres, Lee, with the assent of Graham, made a compromise with Mills, in 1809, whereby it was agreed that they should pay him the value of his improvements, and that he should convey to them his interest in the two thousand acres which had been granted to him, excepting about one hundred and fifty acres which he ha,d previously sold and conveyed to Smally and others, and the value of which was to be deducted from the assessed value of his improvements.
In 1810, Mills made a conveyance, in fulfilment of the foregoing agreement.
In 1815, not two years after Arthur Fox, the ward, had attained twenty one years of age, he entered into a contract in writing with Lee and Graham, reciting that the purchase from the trustees of Graham’s father was made in part for' Arthur’s benefit, so far -as that claim interfered with tha land devised to him, and that he might be prejudiced thereby, if it should be ascertained to be better in equity than his title, and therefore stipulating that, by paying his just ratio of the four hundred dollars which had been given for it, he should be entitled to the benefit of it to the extent of its interference with the devise to him. And in 1816, they made a conveyance to him, in fulfillment of that agreement, and embracing, also, two hundred and twenty *173 two acres of the land which had been allotted by his father to Mills, and was not, therefore, included in the devise to‘himself; and for which he conveyed to them eighty seven acres of the land devised to him, and gave them his bond for nine hundred and twenty four dollars.
In 1829, he filed a bill in chancery, enjoining a judgment they had obtained against him, on his bond, for nine, hundred and twenty four dollars — alleging, among other things, that he had, within two years preceding that time, discovered, from a written proposition for an arbitration made by Lee and Graham to Mills, shortly after the date of his deed to them, that they had made the compromise with Mills, in trust for the benefit of himself and his co-heirs, which fact they had fraudulently concealed from him; and therefore praying, among other things, for a rescission and restitution, and for an enforcement of the alleged trust."
In their answers, Lee and Graham denied that the compromise with Mills was made in trust, but virtually admitted-that the purchase from Graham’s trustees was made chiefly for the purpose of benefiting the complainant and his co-heirs, to the extent of any interest which they had in the twenty seven hundred acres granted to their father.
They insisted, also, that they should not be affected by any thing contained in the proposal made to Mills: (1) because it was 'only a proposition never acceded to; (2) because Mills afterwards having sued them in equity, for a rescission of the compromise they had made with him^-relying, in his bill, only on the allegation that they had procured it fraudulently, by suppressing the fact (well known by them, as he alleged,) that the entry on which the patent to Graham’s trustees was founded, had been withdrawn,_ and that, therefore, the patent itself was fraudulent and worthless — his bill was dismissed'for want of equity, and this Court affirmed the decree, by an opinion reported in 6 Monroe, 91; and (3) because .the complainant, being a defendant in Mills’ suit, did not, in his answer, either admit that Mills had been defrauded, or intimate that any interest of his own *174 or of his co-heirs was employed as an inducement to move Mills to the compromise, or that it was made for his own benefit, even though the written proposition to Mills, now relied on, was filed as an exhibit in that
In an amended answer, in the nature of a cross-bill, Lee and Graham prayed that, if the testator’s title, to the portion of land allotted by him to Mills, did not pass to him by the will, which referred to and seemed to recognize some such allotment, the Court would compel the complainant and his co-heirs to convey the title to them, as the alienees of all Mills’' interest.
The writing relied on- in the bill, and resisted by the answers, signed by Lee and Graham only,' and dated September 19, 1810, is in these words:—
“ Whereas Henry Lee, acting in behalf of the heirs of “ Arthur Fox, deceased, and Richard Graham, deriving “ title from an entry of twenty thousand acres of land “ in the name of Ed. Graham, did institute a suit against “Edward Mills and others, for two thousand acres of “ land, entered, surveyed and patented in his own name, “ it being the same whereon he then lived; and where- “ as the said Ed. Mills did, some years past, institute a “ suit against the said Arthur Fox, in his lifetime, for “ the interference between the said Mills’ claim, and the “ said Fox’s claim of twenty seven hundred acres, and “ the said Fox, under a mistaken idea of the superiority of “ his own claim, entered into an agreement with the said “ Mills, bearing date the 15th day of September, 1793, “ by which he obliged himself to transfer a certain pro- “ portion of his land to the said Mills, in- order to quiet “ the said suit; and whereas the said Mills, after taking “ counsel and mature consideration, entered into a com- “ promise- with the said Lee and Graham, for the pur- “ pose of quieting their suit against him, on the follow- “ ing terms, [here the agreement is recited;] and where- “ as, from recent circumstances, the said Mills appears “ dissatisfied — it is now agreed, by the said Lee and “ Graham, that they will submit the following questions “to -- -, gentlemen learned in the laws “ and well acquainted with the principles on which the *175 « land decisions in our Supreme Courts are founded— “ that, after taking into view the whole of the circumstances « relative to the several compromises heretofore had between « the said Mills and Fox, and also between the present “ parties, shall be of opinion that the said Lee, acting « for the infant heirs of said Fox, and Graham ought to “ give up to said Mills the aforesaid agreement, entered “ into as aforesaid between said Mills and Fox, then “ and in that case, they agree to pay Mills for the land, “ one dollar per acre for all the land held by Mills un- « der the said agreement, except ” &c. &c.
Deree and appeal.
It appears from this writing alone, that, when Mills conveyed the two thousand acres'to Lee and Graham, he also surrendered to them Fox’s bond for a conveyance according to the terms of the compromise between himself and Fox; and the tone and tenor of the writing may also intimate, that one motive, if not the only one, for that surrender, was an apprehension that the compromise with Fox could not be enforced, and a title coerced in a court of equity. ■
Facts, sworn to by some of the witnesses whose deposition's were read on the hearing of this case, conduce to show that Lee, more than once, declared that he had made the purchase from Graham’s trustees, and the compromise with Mills ,lfor the benefit of Fox's heirs,” and that, immediately after making the compromise, he said that he had made for Fox’s heirs the best trade he had ever made in his life. But there is no satisfactory proof of his having used, for either of those purposes, any other funds than his own; on the contrary, we should rather infer that he had not applied to either purpose, any portion of the trust fund. However, not only is this not certain, but there can be no doubt that he knew- that their funds would be amply sufficient for his indemnity.
The Circuit Court was of the opinion that the pur•chase from Graham’s trustees, and the compromise with Mills, should be deemed to have been made in trust for the benefit of the complainant, as devisee,.and also for that of himself and his co-heirs, so far as the claim of those trustees and that of Mills interfered with that *176 part of the twenty seven hundred .acres which had not been devised to the complainant; and therefore rendered an interlocutory decree for ascertaining facts necessary for determining the amount of contribution he should make, and the extent of restitution to which he should be entitled, and also dismissed the cross-bill.
A purchase may be made with an intention of holding it for the benefit of another; but if the parties are strangers in law, and the purchaser uses only his own mo ney in the purchase, a Court of Eq. will not com pel him to carry such gratuitous intention into effect. But—
A trustee cannot, by his own act, acquire an interest in the trust estate, hostile to that of his cestui que trust, or inconsistent with the proper fulfilment of his fiducial duties. A purchase by a guardian, of a land claim adverse to the title of his wards, is within this principle. And— Where one of several jointtepants or co parceners buys in an incumbrance on the joint estate, the purchase will inure to the equal benefit of his co tenants, if they elect to participate in the purchase, upon condition of paying their due proportions of its actual cost. — And a purchase by the husband of a coparcener, is within this principle.
*176 By consent, an appeal is prosecuted for the purpose of reversing the interlocutory decree.
Had the appellants been strangers in law to the appellee and his co-heirs, there could be no doubt that, if— as may be most probable — they purchased with their own funds, the title of Graham’s trustees, and the claim of Mills, they would not hold them upon any implied or resulting trust which could be. enforced in a court of equity, even though they had in fact made the purchases with the intention of holding the titles as mere trustees; for a court of equity could not enforce such an unexecuted gratuitous intention.
Nevertheless, we are of the opinion that the principle of the decree, by the Court below, is just and maintainable;
First. It is a well established principle of equity, that a trustee cannot, by his own act alone, acquire an interest hostile to that of his cestui que trust, or inconsistent with the full and proper fulfilment of all the fiducial obligations. And it is equally well settled, upon analagous reasons of policy and right, that a purchase, by a joint tenant or co-parcener, of an incumbrance on the joint estate, shall, at the election of his co-tenants within reasonable time, be held to inure to the equal benefit of all the tenants, upon condition only that they will contribute their respective ratios of the consideration actually given for the incumbrance. And therefore, as to so much of the twenty seven hundred acres of Arthur Fox, deceased, as was not devised to the appellee, and the legal title to which was in himself and co-heirs, Graham, who had a legal and joint interest therein, as the husband of one of those heirs, maintained a relation to the co-heirs similar in effect to that in which Lee, as their guardian, stood; and therefore, the equitable rights of the appellees are just what they would have been had *177 Lee alone, whilst he was his guardian, made the purchase from Graham’s trustees, and the compromise with Mills. And, considering the relation then subsisting, all the equitable consequences flowing from it, and the circumstances now disclosed, we cannot doubt that, unless the appellee shall have been prejudiced by his own voluntary'conduct since his wardship ceased, he has an equitable right, to the extent of his claim in the twenty seven hundred acres, as devisee and as heir, to elect to claim the benefit of the purchase from Graham’s trustees, and of the compromise with Mills, by contributing his ratio, of the amount which has been actually expended by the «appellants, in making that purchase and compromise. This is virtually conceded by their counsel, to the extent of the appellee’s interest as devisee. But they insist that the same principle does not apply to so much of the twenty seven hundred acres as the testator had agreed to convey to Mills; because, to that extent, as the counsel argue, the appellee and his co-heirs had no beneficial or available interest, and therefore, so far, there was no implied obligation upon .their guardian and co-tenant to abstain from acquiring, for their own personal and exclusive benefit, the claim of Mills. Neither the application nor the force of this argument can, however, be admitted, when all the facts are properly considered. We do not know that the appellee and his coheirs could have been compelled to consummate their .ancestor’s executory compromise with Mills; and it is evident that their guardian and’ their co-tenant of the legal title,.having obtained their ancestor’s covenant to Mills, have placed themselves in collision with the co-tenants of the one and the wards of the other, and are *178 now seeking a specific execution of the covenant, and a surrender to themselves of the legal title. Whether Mills could have enforced that covenant in a court of equity, may be doubted. But the facts respecting his equity must be presumed to have been within the knowledge of the appellants. And that knowledge, the confidential relations they sustained towards the appellee and his co-heirs, made it the duty of the appellants, not only to obtain, but to use, not for their own exclusive benefit, but for that of all those who were interested therein, and for whom alone it was their province to act as faithful trustees. But even had the equity of Mills been undoubtedly available, would it be consistent with policy or justice to permit the guardian to buy such an equitable incumbrance on the legal title of his wards, and to enforce it, against their will, for his own benefit, merely because he chose, for his own advantage, to buy it for an inadequate price, paid even out of his own funds, when the wards are willing to refund what he thus paid? All the authorities, in our judgment, answer no. A. fiduciary has no right thus to use the knowledge and authority acquired by the trust reposed in him, and to speculate on the interests of his cestui que trust. Whatever he does, affecting their interests, they have an indisputable right to claim as having been done by their trustee for their benefit, upon equitable terms. And if any other doctrine should be sanctioned, infants might, indeed, be devoured by those who are appointed to take care of them, and to guard and promote their interests. It was Lee’s duty, as guardian, to take care of the land of his wards, and defend their title; and it should never be admitted that he should, by deciding, however honestly, on their rights or obligations, speculate, for his own personal benefit, on their title or liabilities, to their prejudice, and against their matured and considerate will; and the more especially when it is not certain that, in ■making the speculation, he did not use their funds, and must be evident that he availed himself of information ■derived from his relation of trustee. Moreover, as Lee and Graham purchased the conflicting title of Graham’s trustees for the joint benefit of themselves and Fox’s *179 heirs, all those parties should, be deemed as jointly interested therein, when, afterwards, the compromise with Mills / was made. And therefore, that compromise should:be held as having been made for the benefit of "those heirs.
F. held a legal title to a tract of land; for which, M — alleging that he had a superior equity— brought suit. They compromised, and divided the land, and M was put into possession of the part allotted to him; but before the conveyances were made, to carry the compromise into full effect, F died — leaving a will, by which he devised the land —except what he had surrendered to M — to his son. Several years afterwards L, who had married the widow of F, and was the guardian of his children, purchased, in con junction with r-, who had married a daughter, and heiress of F, a third claim, which covered all the land in dispute; and, by setting up that claim against M, induced him to relinquish and convey all his interest to them — they merely paying for his improvements. In this compromise, L and G obtained the obligation which F had given to M for a title, upon their compromise. Whether that obligation could have been enforced against the devisee and heirs of F, was questionable, and that consideration evidently operated with M to induce him to make the new compromise and surrender that obligation. Land G are presumed to have known the nature of M’s claim, as well as the other titles; which knowledge they had no right to use for their own advantage, to the prejudice, or to the exclusion, of those who were the wards of the one, the co tenants of the other: held, therefore, that the purchase or compromise, made by L aDd G with M, shall inure to the benefit of the devisee and heirs of F — they contributing their equal 'portions of the consideration actually paid.
Recital of circumstanceswhich tend to show, that M. considered it very doubtful whether the obligation for a title which he had received of F, could be enforced against his heirs, and induce-the belief that, it-was with that, view, that M surrendered that obligation to L and G: and held that, as the consideration upon which M made that compromise,thus passed, in fact, from the devisee and heirs of F — L and G. must, on that, ground alone, be considered as hoi ding the title thus acquired, intrust for them, or rather as having extinguished that adverse claim for. their benefit.
Second. But it is evident, not only that the availableness, to Mills of the testator’s compromise with him, was at least questionable, but that that fact was a principal consideration for the surrender of the covenant by him to the ' appellants. This may be inferred from their compromise with him, and is confirmed by their subsequent proposition for an arbitration; and this being their own declaration in writing, is, though never accepted, evidence against them of the facts therein stated;, and shows satisfactorily that Mills surrendered the bond, to them, chiefly because he apprehended that it could not be enforced, and believed that they were making the compromise with him for the benefit of the devisee and heirs of Arthur Fox, deceased. ' This conclusion, thus so obvious, is also fortified by Lee’s subsequent com duct and declarations, and by the' fact that Mills rejected the proposed arbitration, and, in his suit for a rescission of the compromise, relied solely on the charge that the appellants defrauded him by concealing important facts and making false representations respecting the superiority of the title of Graham’s trustees over that derived from his own entry and patent. Mills says, in his bill, that his own entry was worthless; and we feel authorized to infer that he rejected the proposition for an ar. bitration mainly, if not only, because it required a reference and decision of the question whether his compromise with Fox should be enforced, and because he was apprehensive that the arbitrators would decide that it ought not to be specifically enforced, and that, therefore, notwithstanding the worthlessness of th.e pretended claim of Graham’s trustees, and the alleged fraud of the appellants concerning it, the arbitration^ as proposed, would be unavailing to him.
As it thus appears that the doubtfulness of Mills’ equitable right to enforce the compromise with Arthur Fox, deceased, was used as a lever in obtaining the *180 compromise between himself and the appellants, ^.nd was also afterwards successfully used by them, when he proposed a rescission of that compromise — the consequence must be, that at least one consideration for the surrender to them of the testator’s covenant, moved from the appellee and his co-heirs, and that the appellants contributed nothing, or but little, of their own. And hence, on this ground alone, had there been no other, they should be considered as holding that covenant for the benefit of those who hold the legal title, or rather as having taken it in, and extinguished the incumbrance, resulting from it, upon the title of the devisee and heirs of Arthur Fox, deceased, in trust for their benefit: consequently, the appellee and his co-heirs had a right to elect to take the benefit of the compromise with Mills, so far as it affected their ancestor’s covenant; and in making that election, they should reimburse The cost of the compromise, and though the pretended equitable title of Graham’s trustees is now ascertained to have been altogether worthless and unavailing, a just ratio of the sum expended for it by Lee and Graham, should be refunded to them, because we do not feel authorized to decide otherwise than that they bought it in good faith ■ — believing that it was an incumbrance which might jeopard the title of Arthur Fox, deceased.
Though a title bought in by a guardian and co-tenant, was in fact, worjhless, as they purchased it in good faith, believing it would be beneficial to the estate of the wards and co tenants,— the purchasers are en titled to be reimbursed for a proportional part of theprice paid, by the heirs who claim the benefit of a compromise obtained by using it.
A party filed his bill claiming the benefit of a compromise which had been made respecting titles to land, within two years after the discovery of the facts which show that he was entitled to the benefit of the com promise: held, that, though the compromise was made near twenty years before, the lapse of time does not preclude him from asserting his rights under it.
*180 The only remaining question is, whether the appellee is now entitled to the relief contemplated by the interlocutory decree. And, as that decree seems to be based on proper equitable principles (if he now be entitled to any relief,) we are of the opinion that it should not be disturbed, unless he has waived his original equity, or should not be allowed to have a several and sole decree for relief, so far as he is personally concerned.
There can be no pretence for presuming a waiver from the lapse of time only; because it is intrinsically probable, as alleged by the appellee, that he was not, sooner than about two years prior to the filing of his bill, aware of the facts disclosed by and inferable from the written proposition made by the appellants to Mills, for an arbitration, or of any other fact that would show that his ancestor’s covenant to Mills had been taken up *181 by the appellees, without any Valuable consideration from .themselves, or upon any consideration, which would entitle them (the heirs) to the elective benefit of the contract.
A party soon sifter -coming of age, made aeon, tract with his late guardian and a co tenant, the effect of which was to.preclude him from asserting important rights: he is relieved on the ground that,facts material to the understanding of his rights, tho’ known to the other party, were unknown to him, and, of the influence the guardian may then have had over him.
Nor should he be precluded from relief merely because, after he attained twenty one years of age, he made the contract, which he did, with the appellants: (1) because it neither appears, nor should be presumed, that he was then, acquainted with the facts now deemed most material in his favor; and (2) because, having but recently put off his wardship, he should not be concluded by a disadvantageous compromise made with his late guardian, in whom he repose'd full confidence, and who not only must still have had great influence over his judgment and his will, but did not, as we are bound judicially to infer, communicate to him all that he himself knew, and had done, whilst he ,was guardian.
To do complete justice, and prevent multiplicity and uncértainty, it would have been certainly proper to make all the heirs of Arthur Fox, deceased, parties; and it does not appear that Arthur F. Dobyns, who is one of those heirs, was ever made a party. But the want of parties is not assigned for error. And moreover, not only was the appeal prosecuted by consent, for the purpose of settling the principles which should govern in rendering a final decree, but all the proper parties, if desired, may yet be brought before the Court, and may either ask to be permitted to participate, upon equitable principles, 'in the benefit of the purchase and compromise made by the appellants, or may acquiesce, so far as any of them may be concerned, in the claim to exclusive personal benefit therein, asserted by the appellants,
Wherefore, upon the errors as.assigned, it is our opinion that the interlocutory decree for relief should be affirmed. .
And upon the cross bill, we are satisfied that the appellants are entitled to no relief; and-therefore the decree dismissing their cross bill, praying for a conveyance from the heirs of Arthur Fox, deceased, is also affirmed.