Caeuthebs, J.,
delivered the opinion of the court.
The ■ complainants and defendants are all, the heirs of John Tisdale, senr., who died in Boston, in 1798, ihe owner of a large quantity of lands in West Tennessee. The lands were incumbered at the time of his death with a mortgage in favor of Blake & Green, assigned to Mrs. Mary Gilman, and the title otherwise in dispute. Much legal controversy in relation to it ensued, which was mostly attended to, and conducted to a successful result by James Tisdale, Jr., one of the heirs. The estate being insolvent, with the exception of this property, and most of the heirs otherwise poor and unable, or unwilling, to discharge the mortgage, a decree passed in 1830 for the sale of the land to foreclose the mortgage. To meet this emergency and save the lands, the defendant, Daniel, and his brother-in-law, Horton, borrowed $6000 from one Gummings, for which they gave their bond, with personal surety. With this money, Daniel attended the sale under the decree, and in November, 1830, bought 5000 acres of the land at 70 cents per acre, and at a sale for the balance, in May, 1831, bought 28,580 acres, at nine cents per acre; making in all, 33,580 acres, for $6072. These sales were confirmed, and the title vested in the said Daniel, individually; who constituted the defendant, Loving, his agent, to sell the land as he could. His first sale by Loving, under this authority, was made in 1832, and' up to the filing of this bill he had sold and paid over the proceeds to the said Daniel, to the amount as *598 charged in the bill, of $47,000, but he states from 35 to $40,000. The mortgage debt, with interest, was about $6000, and this was paid by Daniel on his said purchases in November and May. The debt to Cummings was paid at various times from 1836 down to 1844, when the balance of $3245 19 was paid. These payments were doubtless made by Daniel out of the proceeds of the land sales made by Loving, as his agent.
The object of this bill is to make Daniel, account, as' trustee, for all the money he may have received, after deducting the amount paid out by him on said note to Cummings, and other expenses, together with a just compensation for his trouble; and to establish the title of complainants as co-heirs to the land still unsold, and held in the name of defendant.
The defence is, 1st: That he purchased the land at a judicial sale for himself, with funds of his own, for which the complainants were in no way liable, after ■they had all failed, and some of them refused to be- • come bound, and consequently he is entitled, individually, to the benefits of his purchase, as the risk, hazard and trouble were all incurred by him. And 2nd, that he is protected by the statute of limitations, and .at all events, by the lapse of time, as it was more than twenty years from his last purchase, and the ves-titure of title before the bill was filed.
1. Can the ground of defence first stated avail him? We think not, for several reasons. He was jointly interested in the land with the complainants as tenant in common, by descent. As such, he will be regarded as acting for all in the removal of an incumbrance, or perfecting the title, unless the contraiy is clearly made *599 to appear. 1 White & Tudor Leading Oases, 56. Tenants in common by descent, are placed in a confidential relation to each 'other, by operation of law, as to the joint property,' and the same duties' are imposed as if a joint trust were created by contract between them, or the act of a third party. It may be different, where they claim title by distinct purchases, even of the same original title, but that is not the case before us. Being then interested with, and for ‘ each other, in the property, each one is prohibited from acquiring rights in it, antagonistic to the others. 1 White c§ Tudor, 53. Being associated in interest as tenants in common by descent, an implied obligation exists to sustain the common interest. This reciprocal obligation will be vindicated and enforced in a court of equity, as a trust. These relations of trust and confidence bind all to put forth their best exertions, and to embrace every opportunity to protect and secure the common interest, and forbid the assumption of a hostile attitude by either; and therefore, the purchase by one of an outstanding title, or an incumbrance upon the joint estate, in his own name, will enure to the equal benefit of all, but they will be compelled to contribute their respective ratios of the consideration actually given. 6 Dana, 171, 176, and 5 Jo., ch. 388, where chancellor Kent, in the case of Vanhorn vs. Fonda, lays down the doctrine ably and correctly: “The condition of equal contribution to the expense of the purchaser, has been complied with in the case before us, by the application of the proceeds of the sales of the common property. If this had not been so, and the money not brought into court, the same would be raised out of the land by sale.”
*600 There may he cases where one tenant in common may purchase in an outstanding title for his own benefit, but this is not one of them, nor is this a case of that kind, but it is one where an incumbrance of a mortgage was removed, in such a case we are aware of no exception to the application of the rule stated.
But the purchase in this case was • made under a decree to foreclose the mortgage, made by the ancestor upon the property descended. This, it is insisted, saves the defendant from the operation of the general pervading principle we have laid • down. We are not prepared to admit that there is any such exception, where the decree is made for the satisfaction of an incumbrance, and no provision inserted in the decree, allowing the common owners to become purchasers. But in such a case, we think the law is- otherwise. Any one of the joint owners may purchase, and the sale is good, but the benefits must enure to all and not to Mm alone, unless the others choose to acquiesce in it, either before or after the purchase so as to bind them, and in such a case as this, there can be no difference between a sale under the deed and a decree upon it. Whether the same principle would apply in sales for the general debts of the ancestor, or for partition, need not now be considered.
In the ease under consideration, however, we do not think it important to examine that proposition furthei*, as we regard the defendant in the light of a direct express trustee for the complainants, in .his whole connection with these lands, from and at the time of his purchase to the present time. We think it is clearly established, that he was clothed with that character at *601 the commencement, and that it has never been successfully thrown off, but that it closely adheres to him, and must regulate the rules of his liability.
This depends upon a controverted fact in relation to the nature and objects of a writing executed by him and deposited with his brother-in-law, Horton, now deceased, whose children are complainants. Much proof and argument have been directed to this point. The bill charges that the said sum of $6000 was borrowed by defendant and Horton, for the express object of redeeming the land from the mortgage of Mrs. Gilman, for the benefit of all the heirs, and placed for that purpose in the hands of defendant, as agent, whose obligation was executed to that effect, and retained by Horton till 1842, when it was delivered up to defendant, in conformity to some private arrangements between themselves, and destroyed. The answer admits the existence of a paper, but says it only embraced stipulations between Horton and himself, which were complied .with at their settlement in 1842.
“The precise language of this agreement;” (says the answer) “is not recollected by' the defendant, but his best remembrance, is, that he was to give the said Enoch Horton a share, as one of the heirs of James Tisdale, of all such lands as he might purchase.” In the next paragraph, in answer to an allegation and interrogatory in this bill, he adds:
“Something was said in the agreement about the heirs of James Tisdale, but what it was, this defendant cannot recollect, nor has he any opinion or belief as to what interest, if any, was secured to said heirs by said agreement. Of one thing he is very certain, that *602 the heirs of said James Tisdale were not consulted about the agreement, nor were any but this defendant and Horton parties to it, nor was Horton in any way their agent, or acting for them in the matter,” nor was it intended or agreed, that he was to act as trustee for them, nor were any of them but Horton to be interested in any purchase he might make. He states that he afterwards, in 1842, settled with Horton, and paid for his interest, a debt which he owed to Simon Tisdale, of $3386 84, for which a receipt is exhibited. This he says he agreed to do,' upon the condition that Horton would surrender or destroy . said written agreement, and the one or the other was done. Hut in relation to the written agreement, he says, “he has no very distinct recollection of what became of it, but his best impression is, that it was destroyed at the request of Horton. It is not now in the defendant’s possession, nor does he believe it is now in existence.” So it seems that “ now” that is, at the filing of the answer it was not in existence, according to the best belief of the defendant. It is very singular so important a paper should be lost or intentionally destroyed by him, if it was of the tenor and purport he states.
“Something was said in it about the heirs of James Tisdale,” but what it was, or what interest, if any, it secured to them, he cannot recollect. Other proof then must be referred to, to ascertain its contents. Samuel T. Tisdale, a son of James Tisdale, jr., proves that he saw it in the hands of Horton in 1832, and that it bound the defendant, “to act as agent in the matter, concerning the Tennessee lands, for the benefit of the heirs of James Tisdale, the elder.” In his deposition, he ex- *603 Mbits a letter which he wrote to his father in 1833, which contains this statement, in relation to the instrument signed by Daniel; its purport is, “that'he was to act for the benefit of the heirs without appropriating any thing to his own purpose individually; and it was stipulated in that obligation, that he was to proceed to Tennessee as an agent for the heirs, precluded ■ himself entirely in that obligation from doing or acting differently from what you as an heir would approve. The obligation I saw, read it, and it is now in existence. It was Daniel’s own request that such an instrument should be executed before he left, to guard against any, innovations upon the just rights of the heirs. I am perfectly satisfied myself that there is no disposition on his part, whatever, to wrong you out of a dollar.”
This letter was written after the purchase by Daniel in his own name, and to allay the fears that had, it seems, arisen in the mind of James, as to his inten.tions and purposes. The witness had just held a conversation with Horton oú the subject, at the instance of his father, and inspected the instrument, and his recollection was fresh as to its contents, which is strongly corroborative of his present statement of its character.
The deposition of Benjamin Parsons, is conclusive as to the character in which Daniel was acting. The witness was the attorney, and agent, for the Boston creditors, of James Tisdale, the' elder, and visited this State every year from 1830 to 1836, on that business, in connection with these lands. His object was to make them liable for the debts he represented. He says Daniel told him in 1831, that he was acting for all the heirs, and in 1833 that the lands belonged to all the heirs. *604 “He always said-, that the lands there, belonged to all the heirs of his father.” Again: “In all the conversations I had with Daniel, and I believe they were at four or five different times, he never once gave me to understand that in paying the mortgage, as aforesaid, he was acting solely for his own benefit, or to get the land for his own use, but he said in all that he did, he considered he was acting ' for the benefit of all the heirs of his father, to whom he considered the lands belonged.” Again, in answer to another interrogatory, he says, “in 1834 and 1835, I had conversations with him on the .same subject, when he repeated the statements made to me in former years, and gave' me to understand that the lands belonged to all the heirs equally, only, that he had a claim or lien extra on them, for the amount he had paid on the mortgage to redeem them. His whole object, he stated, was to free the whole land from the incumbrance of said mortgage.”
This witness is in no way ' impeached, nor is his credit affected by any interest, or connection with the parties, and the facts he states are surely conclusive as to the character in which the defendant was acting, and well comport with the existence and stipulations of the written obligation as described by Samuel T. Tisdale. J
Mr. Fogg, who was the attorney of the heirs, speaking to the same point, says, that he considered Daniel as the “agent of his brothers and sisters, and that his object was to secure himself and Horton for their advances, and to receive a liberal compensation for his services and trouble in coming to this country, and to prevent the creditors of his brother James from taking *605 all his interest in the property, and to prevent the creditors of Ms father from obtaining the benefit of a long and complicated law suit, when they were unwilling to advance any money for its prosecution. There were also one or two of his brothers who would render no active assistance, and he wished them not to have any right, to control the property.”
It also appears from the evidence of Mr. Fogg, that the title to these lands was at the death of James Tisdale, Sr., mostly, if not entirely, in a -man by the name of Daniel Wheaton, and the object of the protracted and expensive litigation commencing in 1819, and terminating perhaps in 1830, to which James, jr., attended under a power of attorney from the other heirs, was to establish the right of James Tisdale’s heirs to one moiety of it, amounting to about 60,000 acres. This favorable result however, was incumbered with the mortgage aforesaid, to raise the one-half of which, the lands recovered were decreed to be sold in 1830, as before stated. The mortgage had been given by "Wheaton to secure the sum of $8,000, borrowed for the joint adventure, and which was vested in the said lands.
It seems that it was in consequence of the advice of counsel, that the defendant permitted the land to be sold under the decree, ánd became the purchaser, instead of discharging the incumbrance by paying off the decree without a sale, as was his purpose when he came out. This fact of itself is sufficient to show that he procured the funds and came out to relieve the land for the benefit of all, for the joint benefit, and not .to ■become a purchaser on his own account in severalty. *606 The reason, given for the advice to purchase in his own name was, that it might more effectually ward off the creditors of his father from the whole, and those of his brother James, frtím his part, and these were the reasons, as Mr. Eogg understood Daniel, that operated upon him.
Without further reference to the facts, as developed by the pleadings and proof, it is sufficient to say, that to our minds the conclusion is irresistible, that Daniel undertook to act for the benefit of all the heirs in the writing executed by him, and that his determination to appropriate the large benefits of the operation to himself, was not thought of at the time, or until long af-terwards, and that if the purpose was entertained, it was not disclosed until very recently before the filing of this bill. His own declarations to Kennedy, just before the filing of the bill, were to this effect.
There has been much darkness and obscurity observed in his actions, and more still in his conversations with the heirs. They, or at least most of them, have certainly been induced by him to believe that all things would come out right in the end, and full justice be meted out to them at the proper time. The sales of the lands were still progressing, and the business not yet prepared for final settlement. So, if it were a trust at all, it was a continuing and unclosed one.
But what is the legal consequence of the conclusion at which we have arrived as to the existence of the written obligation by which an express trust was created? But another argument is here made, which is entitled to notice, before we answer that question. It *607 is, that in case of a lost instrument, very clear and explicit prqof of its contents is required, before it will be set np as the foundation of rights and obligations, and that such is not the case here, bnt it is insisted that the contents of the paper are too vaguely and unsatisfactorily made out to authorize a court to decree its specific execution, or to make it the basis of a decree. The rule is correctly laid down by O. J. Marshall in 1 Peters, 591. “The proof of the contents of a lost paper ought to be such as to leave no reasonable doubt as to the substantial parts of the paper.” 9 Wheaton, 597. It may be remarked, that the strictness of the rule on the subject of the contents of lost papers, is somewhat relaxed in cases where they have been lost, withheld or destroyed by the person to be charged; as spoliators cannot claim the advantage of the strict rule. But without any abatement of the rigidity of the principle, as laid down by the authorities, we must say, that the proof leaves no reasonable doubt upon om1 minds of the “ substantial parts of the paper” in question. We consider them folly and fairly made out.
A princely estate in lands was at stake; it had been rescued from the first hazards to which it was exposed, by the long and laborious personal attention and efforts of James, one of the joint owners, with some pecuniary assistance from Horton, and again it was in danger of being sacrificed for this mortgage debt, amounting to but a very small proportion of its value, and Daniel and Horton by the use of their credit, were enabled and undertook to rescue it, for the common benefit. To evince that purpose, to guard against the accident *608 of death, and to allay any suspicions that might then, or afterwards spring np, as to the fidelity of the agent, in the discharge of the trust which he had taken upon himself, the paper in question was executed.
Thus circumstanced, then, could he take to himself, individually, the benefits of his purchase, to the exclusion of his co-tenants? Surely not. Nothing is better settled in equity jurisprudence. It is one of the canons of a court of equity, that one who undertakes to act for others, cannot in the same matter act for himself. Where confidence is reposed,, duties and obligations arise which equity will enforce. A trustee cannot throw off the trust at pleasure, to the injury of the eestui que trust. He will not be allowed to mix up his own interests and affairs with those of the beneficiary. This doctrine has its foundation not so much in the commission of actual fraud, but in that profound knowledge of the human heart, which dictated that hallowed petition, “lead us not into temptation, but deliver us from evil,” and that caused the announcement of the infallible truth, that “ a man cannot serve two masters.” The right to sell, and to buy, cannot exist in the same person, because of the antagonistic interest in the two positions. Hence the fairness or unfairness of the transaction, and the comparison of price and value, or the existence or absence of actual fraud, are not permitted to enter into the consideration of the court. It is enough that the relation of trustee, and eestui que trust, existed. This appearing, the investigation is at an end, and the doctrine applies with all its force. It is certainly too late in the day to require the citation of authorities to establish this doctrine. But they may be found collected *609 in the cases of Keech vs. Sandford, 47 to 58, and Fox and Pitt vs Mackreth, 105 to 146, 1 White & Tudor’s Leading Oases, in Equity, as to the two aspects in which we have discussed this case.
It is, however, not very cogently insisted In the ar.gument, if at all relied upon, that the defendant can he saved from liability to complainants, if the existence of the paper, with the contents, as charged in the bill are established to the satisfaction of the court under the rules of law. This we have said has been done. The defendant, therefore, must be held to account as an express trustee, for all the monies which have been received by him for the resale of the lands purchased at the mortgage sale, with interest, and the title to so much of said land as has not been sold, will be vested in complainants as tenants in common with the defendant. He will be credited with whatever he may have paid out on account of said lands, with a reasonable allowance for his services. The details will be set out in the decree.
It has not been thought important to discuss the questions made in the argument, arising upon, the statute of limitations, and lapse of time, as the view we have taken of the character of the trust, (being express and continuing,) must, as will be readily seen, put those questions out of the case.
Totten, «L, dissented.