## McCLASKEY *et al.* v. BARR *et al.*

### *(Circuit Court, S. D. Ohio, W. D.   August 4, 1891.)*

1. **TENANCY IN COMMON—ADVERSE POSSESSION OF CO-TENANT.**
   A life-tenant of land under a will conveyed her interest in 1838.  Her grantee took possession, and purchased the interests of some of the remainder-men.  The life-tenant died in 1860, and in 1868 the tenants in possession authorized T. L. to purchase the interests of their co-tenants and take conveyances as trustee.  Pursuant thereto, the trustee took conveyances from all persons whom he thought entitled to share as co-tenants.  Improvements were made under the belief that the tenants in possession owned the entire fee, when in fact they only owned 22-36 of it.  *Held,* that the statute of limitation would not run against the co-tenants not in possession, where they did not have actual notice that their co-tenants in possession claimed adversely to them; and the fact that the tenants in possession made improvements, received the rents and profits, and paid the taxes, was not sufficient notice that they claimed title adversely to their co-tenants.

2. **SAME—TITLE BY ANCIENT GRANT.**
   The fact that the tenants in possession authorized a trustee to purchase the interests of co-tenants is sufficient to show that they recognized an outstanding title, and, where they procured a deed of conveyance less than 14 years before suit was brought by tenants out of possession to establish their title, those in possession will not be presumed to have complete title by ancient grant.

3. **SAME—LACHES.**
   Where tenants in possession purchased the interests of some of their co-tenants, and the last conveyance bears date less than 14 years before suit was brought by tenants out of possession to establish their title, the latter will not be barred of their right of recovery on the ground of laches.

4. **DESCENT AND DISTRIBUTION—IDENTITY OF HEIRS.**
   In an action for the partition of land, it appeared that all the claimants claimed under one William Barr, Sr.  The tenants in possession denied the identity of the claimants out of possession.  The land descended to Robert Barr, John Barr, Andrew Barr, Samuel Barr, Jane (Barr) McWhirter, and Mary (Barr) Grafton, brothers and sisters of William Barr, Sr., all of whom formerly lived in Pennsylvania. The evidence showed that the sister Mary (under whom part of the claimants claim) married Daniel Grafton, and moved to Natchez, Miss.; that a Daniel Grafton came to Natchez from Pennsylvania; and that his wife's name was Mary.  One witness testified that she had frequently heard her grandmother speak of Mary Grafton, of Natchez, as Mary Barr, and of the husband and wife as "old Dan and Mary," and that there was no other Grafton family living near Natchez.  A deed dated March 1, 1804, showed a conveyance of lots in Natchez to Mary Grafton, widow of the late Daniel Grafton.  *Held* sufficient to show that the Mary Grafton of Natchez was the sister of William Barr, Sr.

**5. SAME—PRESUMPTION.**

The evidence showed that Thomas Grafton, son of Daniel and Mary Grafton, of Natchez, Miss., removed to Louisiana. One witness testified that John Barr Grafton, of Louisiana, (witness' father,) in conversing with her about his parentage, said that his father's name was Thomas Grafton, and his grandfather and grandmother were Daniel and Mary Grafton, and that he bore his grandmother's maiden name, Barr. *Held* sufficient to show that John Barr Grafton, of Louisiana, was a grandchild and heir of Mary Grafton, of Natchez, although it was not shown that Thomas Grafton was ever married, since the law presumes that every child is the offspring of a lawful union of the parents.

**6. SAME—EVIDENCE.**

The evidence further showed that Robert Barr, (under whom part of the claimants claim,) brother of William Barr, Sr., lived in Westmoreland county, Pa., and that a Robert Barr of that county left a will giving his real estate to John, Robert, and Samuel Barr. One witness testified that the Robert Barr who left the will was her father's uncle, and that she knew Jane (Barr) McWhirter, (sister of William Barr, Sr.,) and that she came to visit Robert Barr, and that he called her sister. Another testified that Robert Barr, of Westmoreland county, Pa., his great-uncle, lived at witness' home for some time before his death, and that Jane (Barr) McWhirter came to his home, and that his great uncle Robert called her sister. A nephew of William Barr, Sr., testified that he had an uncle Robert Barr, but did not know where he lived, and that his father told him he had an uncle in Westmoreland county, Pa. *Held* sufficient to show that Robert Barr, of Pennsylvania, the testator of John, Robert, and Samuel Barr, was the brother of William Barr, Sr., under whom all the claimants claim title.

**7. SAME.**

The evidence further showed that John Barr, brother of William Barr, Sr., had a son Robert. One witness testified that his uncle Robert Barr, who was the nephew of William Barr, Sr., came to witness' father's home, and lived with them for two years; was married there, and afterwards removed to Stark county, Ohio; that witness afterwards visited his uncle Robert in Ohio; and that he was living on a farm five miles from Massillon. Another testified that he knew the Robert Barr who lived on a farm five miles from Massillon, Ohio, and that later the same Robert Barr moved to Wood county, Ohio. October 2, 1812, a patent was issued from the United States to Robert Barr for a quarter section of land in the Stark county, Ohio, land-district. *Held* sufficient to show that the Robert Barr of Wood county, Ohio, was a son of John Barr, the brother of William Barr, Sr.

**8. DEPOSITION—PERPETUATION OF TESTIMONY.**

Rev. St. Ohio, § 5878, concerning the perpetuation of testimony, provides that depositions taken under a petition to take testimony may be given in evidence by either party to the proceeding on a trial between them, or their privies or successors in interest, when the witnesses are dead, etc. *Held*, that where a life-tenant had conveyed her interest in land, and her deposition was taken for the purpose of perpetuating testimony to show the owners of the fee, the deposition is admissible, in a suit for partition of the land between persons claiming as co-tenants, to prove the identity of co-tenants out of possession.

**9. EVIDENCE—ANCIENT DOCUMENTS.**

Where a member of a family, who was the last to leave the old homestead, takes various old documents of interest, among them a copy of his father's will, and the documents remained in his possession for 40 years thereafter, and on his decease the same are found in his desk, and thereafter kept by his son for 30 years, such documents may be introduced in evidence as ancient documents to prove the names of the children named in the will, where their identity is denied.

**10. SAME—ANCIENT WILLS.**

Where a certified copy of a will shows that the will was proved for probate and recorded, the jurisdiction of the officer to make the record will be presumed after 20 years; and, where a will was recorded 65 years before it was offered in evidence, it will be received as an ancient document.

**11. LOST WILL—PROOF OF PROBATE.**

Where a foreign will was admitted to probate under section 5973, Rev. St. Ohio, and the record thereof destroyed by fire, the fact that the probate court refused to restore the records does not preclude claimants under the will from showing that an order had been made admitting the will to probate.

**12. PROBATE OF WILL—EVIDENCE.**

Where a record of a will has been ordered made, and every act done except the writing of the record, the instrument will be considered as recorded.

In Equity.

The bill is for the partition of 161 4-10 acres of land, situate on Price's Hill, in the city of Cincinnati, county of Hamilton, and state of Ohio. The complainants claim to be seised in fee of one undivided fifth part of said land, and that those of the defendants who are in possession, being nearly 300 in number, are without claim or color of title as against them; wherefore they pray for partition, and for an accounting of rents and profits.

The bill sets forth that upon the death, on November 27, 1821, of Mary Jane Barr, who was seised in fee of said premises under the will of William Barr, Sr., the estate vested in his brothers and sisters and their descendants, subject to the life-estate under his will of Maria Barr, afterwards Maria Bigelow, mother of Mary Jane Barr;—that Mary Barr was a sister of William Barr, Sr.;—that she intermarried with Daniel Grafton, and that seven children—Sarah, Mary, and Elizabeth; Daniel, John B., Thomas, and James—were the issue of their marriage.

Of these the bill avers that Sarah, Mary, Elizabeth, and Thomas died without lineal descendants; that the line of James has become extinct; and that the complainants are the descendants of John B. and Daniel, Jr., and are entitled to all the interest of said Mary Barr, sister of William Barr, Sr.

The cross-bill of Laura O. Henley et al. avers that the cross-complainants therein are the sole descendants and heirs of said Thomas Grafton, son of Daniel Grafton, Sr., and, as such, entitled to one-third of the undivided one-fifth interest claimed by the complainants, or, in other words, to the one-third of the interest of the said Mary Barr, sister of William Barr, Sr.

Cross-bills are filed, also—*First*, by Samuel Barr et al.; and, *second*, by Robert Eldridge et al. In the cross-bill filed by Samuel Barr et al., it is averred that the brothers and sisters of William Barr, Sr., were: (1) Robert Barr, of Westmoreland county, Pa.; (2) John Barr, of Franklin county, Pa.; (3) Andrew Barr; (4) Samuel Barr; (5) Jane (Barr) Me-Whirter; (6) Sarah or Mary (Barr) Grafton. That Robert Barr died testate September 15, 1822, leaving his estate to Robert, Samuel, and John Barr, sons of his nephew William Barr, and grandsons of his brother John Barr. Two of the devisees named in the will of Robert Barr, to-wit, Robert and Samuel Barr, are cross-complainants, as are the descendants of the third devisee, John Barr. The cross-bill further avers that the cross-complainants above referred to, together with the devisees of Jane Chapman and the descendants of Martha Reed, are entitled to one undivided thirty-sixth part of said premises by reason of the fact that their father, William Barr, of Westmoreland county, Pa., was one of seven children of John Barr, Sr., and that the line of Margaret Hattery, one of said children, has become extinct.

The complainants in the cross-bill filed by Robert Eldridge et al. claim an undivided thirty-sixth part of the premises as the sole living descendants of Robert Barr, late of Wood county, Ohio, who, it is averred, was one of seven children of John Barr, Sr., and, as above stated, that the line of Margaret Hattery, one of said children, has become extinct.

The lines of descent are specifically set out in the bill and in each of the cross-bills.

The complainants and cross-complainants admit, and the record discloses, that the defendants have bought in, and received deeds of conveyance for, all the right, title, and interest in and to the said premises —*First*, of all the heirs of Jane (Barr) McWhirter, sister of William Barr, Sr.; *second*, of all the heirs of Samuel Barr and Andrew Barr, brothers of William Barr, Sr.; *third*, of all the heirs of John Barr, brother of William Barr, Sr., excepting one thirty-sixth undivided part thereof claimed by Samuel Barr *et al.*, in their cross-bill, and'one thirty-sixth undivided part thereof, claimed by Robert Eldridge *et al.*, by their cross-bill, both as above stated.

The defendants having by their answers denied that Mary Grafton was a sister of William Barr, Sr., and that the complainants are her heirs and legal representatives, or the heirs and legal representatives of a sister of William Barr, Sr., and having set up adverse possession, as a bar under the statute of limitations of Ohio, and laches on the part of complainants and cross-complainants, the complainants filed an amendment to their bill, (which was adopted by the cross-complainants, the answers to their cross-bills having denied the descent and heirship of the cross-complainants, and in all other matters having made the same defenses and pleas as those to the complainant's bill,) in which they set out at length the history of the title of the premises described in the bill, and certain matters of record, amounting, it is claimed, to admissions by defendants of their outstanding claims, within the period necessary to establish either adverse possession or laches.

The defendants answered, denying any personal knowledge of the matters or things alleged in the amendments, or of the title of the tract therein described, prior to the dates when they acquired their interest therein, but admitting, for the purposes of this cause, that on or about the ——— day of May, 1816, William Barr, Sr., died testate, and seised of the lands claimed by complainants;—that his will was admitted to probate by the court of common pleas of Hamilton county, Ohio, at its July term, 1816;—that by said will he devised said tract to William Barr, John B. Enness, and James Keys, his sons-in-law, in trust for his son John M. Barr for life; remainder to his son's wife, Maria Barr, for life, in case she should survive him, and leave issue by him then living; remainder in fee to any child or children of the said John M. Barr; —that on the 10th day of August, 1820, John M. Barr died, leaving his wife, Maria, and one child, Mary Jane Barr, surviving him;—that the said Mary Jane Barr died intestate, and without issue, November 27, 1821, leaving the said Maria Barr, widow of the said John M. Barr, (who afterwards intermarried with one John Bigelow,) surviving her;—that at the time of the death of the said Mary Jane Barr she was seised of the lands claimed by complainants, subject to the life-estate of her mother, Maria Barr;—that afterwards, at the December term, 1867, the supreme court of the United States, in the case of *Lessee of Poor* v. *Considine*, 6 Wall. 458, decided that Mary Jane Barr had a vested remainder in fee in said tract, subject to the life-estate of said Maria Barr, her

mother, which upon her death descended, by virtue of the laws of descent in force in the state of Ohio at the time of the death of said Mary Jane Barr, to the brothers and sisters of William Barr, Sr., or their heirs, as heirs at law of the said Mary Jane Barr.

They further answered that they had no personal knowledge of who were the brothers and sisters of William Barr, Sr., nor had they sufficient knowledge or information whereon to found a belief as to who they were, and that they were therefore unable to answer whether they were the persons named in the amendment to the bill,—John Barr, Samuel Barr, Robert Barr, Andrew Barr, Jane (Barr) McWhirter, and Mary (Barr) Grafton; but they denied on information and belief that Mary Grafton was his sister. They admitted that a deed from Maria Bigelow, dated July 26, 1838, conveying to Ephriam Morgan and Lot Pugh,, in consideration of $2,000, the tract described in the bill, with covenants against her own acts, and of special warranty against all persons claiming by, from, or under her, her heirs or assigns, appears of record in the recorder's office of Hamilton county, Ohio, the same having been recorded January 2, 1839; and they aver that the grantees entered in good faith, under said deed, into the sole, peaceable, open, notorious, and exclusive possession of said premises, adversely to the complainants, and each of them, and all the world.

The answer does not so aver, but the fact is, as appears from a certified copy, that Maria Bigelow's deed is a quitclaim to the grantees, their heirs and assigns, forever.

The answer further admits that Lot Pugh, on September 20, 1839, conveyed by deed in fee all his right, title, and interest in said premises to said Ephriam Morgan, and sets up that he, on the 13th day of September, 1839, entered into the sole, peaceable, open, notorious, and exclusive possession, adversely to the complainants, and each of them, and all the world, but denies that he had no other title thereto than that derived, as above set forth, from Maria Bigelow and Lot Pugh.

The answer further admits, upon information and belief, that Ephriam Morgan, after entering into possession as aforesaid, was advised that the remainder in fee of said land had descended, upon the death of Mary Jane Barr, to the brothers and sisters of William Barr, Sr., and their heirs; and that thereupon, through his son-in-law Dr. William Woods, he purchased the outstanding interest of all the heirs of the said brothers and sisters of said William Barr, Sr., in said remainder, as he then believed. Then follows in the answer a list and general description of sixteen deeds to William Wood, and one deed to Ephriam Morgan, all in fee-simple, and each purporting to convey the entire interest of the grantors in the tract described in the bill. The answer states that none of these deeds contain any recitals as to the relationship of any of the grantors to Mary Jane Barr, or of any particular fraction or portion of interest inherited by the grantors; and denies any information or knowledge as to the relationship of the grantors to Mary Jane Barr.

It is further admitted by the answer that all the interest in said lands so acquired by Wood was subsequently conveyed in fee-simple to Ephriam Morgan, and that Morgan conveyed the entire tract—excepting about

eight acres, the title to which remained in him at his death—to the grantees named in the bill, and as to each of them exclusive and adverse possession is set up.    The conveyances down to the defendants are admitted as set forth in the bill, and it is further admitted in detail that the defendants bought in, through T. D. Lincoln and Fayette Smith, acting as their trustees, outstanding interests claimed by descendents of the brothers and sisters of William Barr, Sr., as heirs of said Mary Jane Barr; the defendants insisting that each and all of said purchases were by way of compromise of pending controversies and buying peace.

So far as it may be necessary, further particulars of the admissions above referred to will be stated in the opinion, as well as averments and denials relating to each of the claims and defenses.    The foregoing admissions, denials, and statements are from the answer of Archbishop Elder, from which the answer of John Keeshan and that of Fannie A. Sands do not differ materially.    These answers have, by stipulation, been recognized as representing the defenses of all their co-defendants, as well as their own, and like answers have been filed to each of the cross-bills.

For former reports of opinion in this case, see 38 Fed. Rep. 165; 40 Fed. Rep. 559; and 42 Fed. Rep. 609.

*C. W. Cowan* and *Henry T. Fay,* for complainants.

*W. S. Thurstin,* for cross-complainants descendants of Robert Barr, of Ohio, *et al.*

*Samuel T. Crawford,* for cross-complainants Robert Eldridge *et al.,* and Robert Barr, of Iowa, *et al.*

*Hudson & Barnett* and *C. W. Cowan,* for cross-complainants Laura O. Henley *et al.*

*Stephens, Lincoln & Smith,* and *Bateman & Harper,* for Archbishop Elder, Fannie A. Sands, John Keeshan, and sundry defendants in possession.

Before JACKSON and SAGE, JJ.

SAGE, J., *(after stating the facts as above.)*    The first defense that will be noticed is the statute of limitations.    That was fully considered in the case reported in 42 Fed. Rep. 609.    We see no reason for reconsidering or modifying the opinion there expressed, adverse to this defense. The death of Maria Bigelow occurred, it appears from the record, August 3, 1860.    As was stated in the opinion above cited, no conveyance made by her could be the foundation of a claim to adverse possession during her life-tenancy, because the right of possession did not, until her death, vest in the heirs of Mary Jane Barr.    The estate in remainder was vested; but the right of possession, and therefore the co-tenancy, was postponed until the termination of the life-estate.    As also stated in that opinion, the defenses of exclusive and continuous possession, of receiving and retaining rents and profits, of paying taxes, and of making permanent and costly improvements, all claimed as indicating an adverse holding and the assertion of absolute ownership, will not suffice, because there is nowhere in the answers any averment of notice to the co-tenants

not in possession, excepting as it is to be inferred from the acts above stated. On the contrary, the answers aver that the alleged adverse and exclusive possession of the premises by the defendants and their grantors was in good faith, and without notice of the claims of the complainants or their alleged ancestors in title, or either of them. We adhere to the conclusions reached in the opinions referred to, that the purchase by Lincoln and Smith, as trustees, on behalf of the defendants, subsequent to the death of Maria Bigelow, and their conveyance over to the defendants, put an end to any adverse possession, if prior thereto it existed. In addition to the case of *Parker* v. *Proprietors*, 3 Metc. (Mass.) 99, cited in the opinion in support of this proposition, see *Vaughan* v. *Bacon*, 15 Me. 455; *Criswell* v. *Altemus*, 7 Watts, 565; *Carpentier* v. *Mendenhall*, 28 Cal. 487; *Carpentier* v. *Small*, 35 Cal. 356,—all holding that the purchase by defendants in possession of the undivided interest of the claimants divested the possession of the defendants of its hostile character. See, also, in support of the same proposition, *House* v. *Fuller*, 13 Vt. 165. These authorities seem to us to entirely dispose of and defeat the defense of adverse possession.

That defense, in this case, leaves out of view the relations of mutual trust which bind co-tenants to defend, or, at least, not to assault, directly or indirectly, each other's interest. When these defendants, or those then in possession, under whom they claim, bought in the interest of heirs of certain of the brothers and sisters of William Barr, Sr., they stepped by purchase into the shoes of tenants in common by descent, and thus succeeded to their obligations to their co-tenants. That these purchases began as early as April, 1838, and were continued in 1839, 1841, 1843, 1845, 1846, 1847, 1850, and 1853, years prior to Maria Bigelow's death, does not change the state of the case, but only goes to establish that Ephriam Morgan understood perfectly that her deed conveyed to him only her life-estate, and that that title could be enlarged only by purchase of the fee from the remainder-men. As a result of each of those purchases, however, those to whose benefit the conveyances inured came, instantly upon the expiration of the life-estate at the death of Maria Bigelow, into the relation of co-tenants with the brothers and sisters of William Barr, Sr., or their descendants, who had not yet conveyed, and became, at once, also subject to the obligations above referred to. What those obligations were is well stated by the supreme court of Tennessee in *Tisdale* v. *Tisdale*, 2 Sneed, 599, as follows:

"Tenants in common by descent are placed in confidential relations to each other, by operation of law, as to the joint property, and the same duties are imposed as if a joint trust were created by contract between them or the act of a third party. Being associated in interest as tenants in common, an implied obligation exists to sustain the common interest. This reciprocal obligation will be enforced in equity as a trust. These relations of trust and confidence bind all to put forth their best exertions, and to embrace every opportunity to protect and secure the common interest, and forbid the assumption of a hostile attitude by either."

Not less significant or emphatic is the language of Chancellor KENT in *Van Horne* v. *Fonda*, 5 Johns. Ch. 407:

"Community of interest produces a community of duty, and there is no real difference, on the ground of policy and justice, whether one co-tenant buys up an outstanding incumbrance or an adverse title to disseise and expel his co-tenant. It cannot be tolerated, when applied to a common subject, in which the parties had equal concern, and which created a natural obligation to deal candidly and benevolently with each other, and to cause no harm to their joint interest."

See, also, Freeman on Co-Tenancy and Partition, § 151, where it is stated that tenants in common by descent are under no other or greater obligations than other co-tenants frequently are. See, also, *Lee* v. *Fox,* 6 Dana, 171; *Picot* v. *Page,* 26 Mo. 421; *Lafferty* v. *Turley,* 3 Sneed, 182; *Saunders* v. *Woolman,* 7 Lea, 302; and *Williams* v. *Gideon,* 7 Heisk. 620.

But it is urged for the defendants, and they so aver in their answers, that the purchases were made only "by way of compromise of pending controversies and buying peace." Let us look into this. Before the death of Maria Bigelow, the only question was, when did the devise over of the remainder in fee take effect, and in whom did it or would it vest? Nobody thought of claiming that Maria Bigelow had or could convey more than a life-estate. The decision of *Lessee of Poor* v. *Considine* (March 23, 1868) by the supreme court of the United States (6 Wall. 458) so completely settled all questions relating to the title of the entire tract that nothing was left open for controversy excepting such disputes as might arise concerning pedigree or identity. Lincoln and Smith were soon after employed by the defendants, and made their trustees, to hunt up and buy out the interest of all the descendants of the brothers and sisters of William Barr, Sr., who, by his will, under the decision of the supreme court, were vested with the fee-simple of the entire tract, excepting what had been conveyed by some of them to the defendants or their grantors. Lincoln and Smith did obtain, by purchase, conveyances from every descendant they could find or hear of. They did not stop until they thought they had secured the last one, and every deed recited the descent of the grantors. It is a misnomer to call those transactions compromises or buying peace, for the record does not disclose that there was in them a single element or suggestion of compromise.

Much stress is laid upon the character of defendants' occupancy, and there is a showing of the costs of expensive and permanent structures and improvements, amounting between 1875 and 1890 to nearly $1,000,000, as indicating ouster and adverse possession and notice, and numerous authorities are cited in support of that contention. But we must not lose sight of the fact that the original possession of the defendants and of their grantors was in privity with the title of the rightful owners, and that it is admitted that neither complainants nor cross-complainants ever had actual notice of an adverse holding; and in that view the character of defendants' occupancy, the permanence or cost of their buildings and improvements, and their long list of decided cases fade into nothingness before the decision of the supreme court of the United States in *Zeller's Lessee* v. *Eckert,* 4 How. 289, that—

"Where the original possession by the holder of land is in privity with the title of the rightful owner, in order to enable such holder to avail himself of the statute of limitations nothing short of an open and explicit disavowal and disclaimer of holding under that title, and asserting a title in himself, brought home to the other party, will satisfy the law."

The defense of laches, and that of the presumption of an ancient grant, will be considered together. The answer of Archbishop Elder, adopted, as already stated, by the other defendants, including Fannie Sands and John Keeshan, contains by way of admission a detailed statement of the purchases made by Messrs. Lincoln and Smith, and by T. D. Lincoln, in trust for the defendants, from which it appears that deeds were made to them at various dates from the 29th of December, 1868, up to and including the 23d of June, 1871, by persons who are described in the recitals of said deeds as claiming by inheritance from the brothers and sisters of William Barr, Sr., as heirs at law of Mary Jane Barr. Those deeds, in each instance, conveyed all the right, title, and interest of the grantors in and to the entire tract. A deed of warranty from Samuel Barr and Catherine Barr, his wife, to Timothy D. Lincoln, his heirs and assigns, forever, in trust for himself and such other persons as were in possession of such lands in separate parcels, (he then having acquired and holding an interest in a portion of the lands in controversy,) recites that—

"Mary Jane Barr, daughter of John M. Barr and Maria Barr, his wife, who after his death intermarried with John Bigelow, all of whom are deceased, at the time of her death was seised of the reversion in fee, subject to the life-estate of her mother, Maria Bigelow, in and to the following described tract of land, under the last will and testament of her grandfather, William Barr, Sr., late of Hamilton county, deceased, [here follows a description of the entire tract of 161 4-10 acres, as described in the second amended bill;] and which, by the said last will, was devised to the said John M. Barr and Maria Barr during their said lives, and the survivors of them, with remainder in fee as specified in said will. * * * And whereas, on the death of the said Mary Jane Barr one undivided fifth part of said reversionary interest passed by descent from her (subject to the life-estate of her said mother, who survived her and died in the year of our Lord 1862) to and became vested in Andrew Barr, late of Fairfield county, Ohio, deceased, and upon his death passed to and became vested in his children and their descendants as his heirs at law, his said children being six in number, namely, Thomas Barr, Nancy Barr, alias Agnes Owens, William Barr, James Barr, Samuel Barr, and John Barr; one of whom, James Barr, died intestate, without issue, leaving his said brothers and sisters his heirs at law. And whereas, said Samuel Barr, son of the said Thomas, not claiming any interest in said lands by descent or otherwise from his said father after his death, claims to be vested with the legal title in fee in and to one undivided twenty-fifth part, and to five-sevenths part of two-thirds part of one-seventh part of one other one thirty-fifth part of said tract of land, by purchase and deeds of conveyance to him therefor, from a number of persons named, stating their supposed relationship to the said Andrew Barr. Therefore," etc., "he conveys," etc.

The answer further admits that there appear of record deeds from sundry persons to Archbishop Purcell, who was the predecessor of Archbishop Elder and from whom Archbishop Elder acquired title by devise.

These deeds recite that the title which they purport to convey was claimed by the grantors as heirs of Jane Barr Mewhirter, and they contain a recital of their heirship as the heirs of Jane Mewhirter.

It is also admitted that all the deeds purported to be executed by the heirs of Jane Mewhirter to the sundry parties in possession contain recitals of the heirship of the grantors as the heirs of Jane Mewhirter, the sister of William Barr, Sr., to whom one-fifth of the property descended.

This cause was commenced in the state court on the 4th day of December, 1886,—less than 16 years after the date of the last deed to Lincoln, and less than 10 years after the date of the last deed to Archbishop Purcell. After the removal of the cause to this court, Robert Livingston Lobdell and Tennie Lobdell became parties, and asserted their claim, July 12, 1887. The cross-bill of Samuel Barr and others, and that of Robert Eldridge and others, were filed October 1, 1889. Laura O. Henley *et al.* were made parties, August 14, 1890, and upon the same day filed their cross-bills. The last of these became parties to this litigation less than 20 years after the date of the last deed made to T. D. Lincoln, as trustee for the defendants, as aforesaid, and less than 14 years after the deed to Archbishop Purcell from the heirs of Jane Barr Mewhirter. We are now asked to presume an ancient grant to the defendants, notwithstanding the above admissions, the facts already stated in this opinion, and the decision by the supreme court of the United States in *Lessee of Poor* v. *Considine* that the defendants' holding was in subordination to the rightful owners, the heirs of Maria Jane Barr; that is to say, the descendants of the brothers and sisters of William Barr, Sr.

That decision was what prompted the employment of Lincoln and Smith to make purchases from certain of those heirs, as has hereinbefore been shown. In pursuing the inquiry whether the law authorizes the presumption of a grant under these circumstances, we must begin with the recognition of the rule that every presumption is in favor of possession in subordination to the title of the true owner. Lawson, Pres. Ev. 414; *Jackson* v. *Sharp*, 9 Johns. 163; *Rung* v. *Shoneberger*, 2 Watts, 23. Next we come to the proposition established by *Ricard* v. *Williams*, 7 Wheat. 59, universally recognized as a leading case, where Justice STORY, speaking for the supreme court of the United States, says that the presumption of a grant can never arise where all the circumstances are perfectly consistent with the non-existence of a grant, nor where the claim is of such a nature as is at variance with the supposition of a grant; also, that it is limited in general to periods analogous to those of the statute of limitations in cases where the statute does not apply; and that, where the statute does apply, it constitutes, ordinarily, a sufficient title or defense, independent of any presumption of a grant, and therefore the presumption is not generally resorted to. So, also, in *Fletcher* v. *Fuller*, 120 U. S. 534, 7 Sup. Ct. Rep. 667, the supreme court of the United States held that, as a general rule, it is only where the possession has been actual, open, and exclusive for the period prescribed by the stat-

ute of limitations to bar an action for the recovery of lands (which in Ohio is 21 years) that the presumption of a deed can be invoked; and the same rule applies generally to the defense of laches. Unless, therefore, there is something exceptional in this cause, there is no foundation for either of these defenses. It is urged here again, as it was in support of the defense under the statute of limitations, that the purchases of outstanding titles were made by way of compromise and to buy peace. To what has already been said on that subject it may be added that there is no evidence to this effect, unless it may be deduced from the recitals in the deeds that the defendants held the lands adversely against the grantors; and that was not true, either in fact or in law, as was held by this court in 42 Fed. Rep. at page 609. Against the recitals is the significant averment in the answer that those purchases were made "without knowledge of the existence of further claims," and "without notice of the claims of these complainants, or their alleged ancestors in title, or either of them." Thus it appears that the understanding was that Lincoln and Smith, as trustees, should buy up all outstanding claims of the Barr heirs, and that the intention was in that way to secure to themselves a complete title in fee. These facts evidence the recognition by the defendants that they were holding in subserviency to the outstanding titles in fee, as clearly as if their explicit avowal thereof were established by proof, and they leave absolutely no ground for the claim that a grant to the defendants is to be presumed. The defense of laches, in our opinion, altogether fails. As we have seen, all the parties complainant came into court within the period of the statute of limitations, and there is nothing shown whereby they can be charged with such neglect of their alleged rights, or with such delay in asserting them, as to operate as a bar.

The determination of this cause, then, depends upon the decision of the questions of fact relating to the heirship of the complainants and the cross-complainants; and, first, who were the sisters and brothers of William Barr, Sr., who it is admitted were heirs of Mary Jane Barr?

William Barr, Sr., was a native of Chambersburg, Pa. He removed to Cincinnati, Ohio, where he died in 1816. It is clear from the testimony that he and his brothers and sisters were reared in eastern and central Pennsylvania. There is practically no dispute that the brothers and sisters were Robert Barr, of Westmoreland county, Pa.; John Barr, of Franklin county, Pa.; Andrew Barr, Samuel Barr, Jane Barr Mewhirter; and Mary or Sarah Barr Grafton. The deposition of Maria Bigelow was taken in proceedings to perpetuate testimony under a petition filed in the court of common pleas of the county of Hamilton on the 29th of June, 1858, by Ephriam Morgan, Mary V. Woods, (widow and devisee of Dr. William Woods, son-in-law of Ephriam Morgan,) Patrick Considine, John Young and wife, B. Henry Carter, Archbishop Purcell, and James T. Morgan, alleging the conveyance of the entire tract by Maria Bigelow to Ephriam Morgan and Lot Pugh, and the subsequent conveyance by Pugh to Morgan of all his interest and title therein, and the still later conveyance by Morgan to his co-petitioners; that

Ephriam Morgan by his deed became possessed of the life-estate of Maria Bigelow, and that under the statute of descent then in force in Ohio the remainder of said estate was vested in the brothers and sisters of William Barr, Sr., deceased, formerly of Chambersburg, Pa., and their descendants, by inheritance from Mary Jane Barr, daughter of Maria Bigelow, and John M. Barr, her then husband, and granddaughter of William Barr, Sr.; and that it was necessary to take the deposition of Maria Bigelow as to matters set forth in said petition, and in the interrogatories therein propounded.

Her deposition was taken on the 12th of August, 1858. A certified copy, together with a copy of the proceedings by virtue whereof it was taken, is an exhibit to the amendment to the second amended bill, and is admitted by the answer. It is also part of the record, as an exhibit of *Lessee of Poor* v. *Considine*, put in evidence by defendants, and competent as a muniment of title. It is objected now that it is not admissible unless competent as a declaration, and that it is not competent as a declaration, because Maria Bigelow, being the widow of John M. Barr and daughter-in-law of William Barr, Sr., was related by affinity, and not by consanguinity, and that her declarations are not, in substance or form, with respect to her husband or his immediate family, but with respect to the brothers and sisters of William Barr, Sr., her father-in-law, and their descendants. Wherefore, say counsel, if the house of lords in the *Shrewsbury Peerage Case*, 7 H. L. Cas. 25, excluded he declaration of the father-in-law with regard to his son-in-law, it is difficult to see on what principle the declaration of the daughter-in-law with regard, not to her father-in-law, but to his brothers and sisters and their descendants, is competent. They also object that it is not competent as a deposition *inter partes*, for the reason that the present claimants were neither parties nor privies to the suit to perpetuate the testimony, and that there must be mutuality. But this deposition was taken under a statutory provision, the same as now found at section 5878 of Smith and Benedict's Ohio Statutes, wherein it is provided that depositions taken under a petition to perpetuate testimony may be given in evidence by either party, or their privies or successors in interest, when the witnesses are dead or insane, or when their attendance for oral examination cannot be obtained. The petition under which this deposition was taken was, as it states, against all the persons known to the petitioners, or believed to be interested in the subject-matter thereof, and included, as is admitted in the answer of Archbishop Elder, all the direct descendants of William Barr, Sr., then known to the petitioners. It is not necessary to give the names of the defendants, who were some 26 in number.

By virtue of section 858 of the Revised Statutes of the United States, the provisions of section 5878 of the Revised Statutes of Ohio apply in this cause; and, without stopping to consider the question whether Maria Bigelow's testimony would be competent as a declaration, it is sufficient to say that it is made competent by the statute as a deposition. She testifies that William Barr, Sr., had brothers John, Robert, and Samuel, and, she thought, a brother named Andrew, who she thought went

to Kentucky, but of this she was not certain; and that he had two sisters, one named Jane, who married a McWhirter, and the other she thought was named Sarah, and married a Grafton, and went to Natchez, Miss. Susan McElroy, granddaughter of Jane and Andrew, who were brother and sister, respectively, of William Barr, Sr., testifies in her deposition taken February, 1884, in the case of *Robert Barr* v. *David Chapman et al.*, (Hamilton common pleas,) and stipulated into the evidence in this cause, that the brothers and sisters of William Barr, Sr., were Andrew, Samuel, John, Robert, Polly Grafton, and Jane Mewhirter. She says that Polly Grafton (Polly being, according to Webster, a variation from Molly, for Mary) was a sister, and that she had a family; that they have it in some of the papers Sally, but her name was Polly. John Barr, of Columbus, Ohio, grandson of John Barr, brother of William Barr, Sr., testifies that his grandfather had brothers William and Samuel, and one whose name he understood to be Robert. In the agreed statement of facts which is part of the record in *Lessee of Poor* v. *Considine*, the brothers and sisters of William Barr are given as Samuel Barr; John Barr; Robert Barr; and Andrew Barr; Jane, married to McWhirter; and Sarah, married to W. Grafton. There is no controversy as to the identity of Jane Mewhirter as a sister of William Barr, Sr.; the defendants in possession having acquired title to her interest by purchase from her heirs. John Barr testifies that Mrs. Grafton was a sister of William Barr, Sr.; that he had heard his father speak of her husband as Daniel Grafton; that they lived in Maryland, or at least in a slave state, and removed to Natchez, Miss. His testimony is, further, that his father told him that two cousins of his, named Grafton, came to his house in Pennsylvania, and remained overnight on their way to Mississippi, where they were about to buy land, and that he spoke of Daniel Grafton and brother or brothers. Thomas Grafton, of Natchez, Miss., grandnephew of Daniel Grafton, Sr., testifies that Daniel Grafton came there some time in the 1780's; that he was a native of the county of Antrim, Ireland, and left home before he married; that he came probably to Pennsylvania, was married, and had several children when he came to Natchez. He knows nothing of the name of Daniel Grafton's wife, excepting that she was called Mary; never heard of his marrying more than once. Mrs. Jane Moore, of Natchez, Miss., sister of the last witness, testified that she knew that the wife of Daniel Grafton, Sr., was Mary Barr; that she heard her grandmother speak of her frequently as Mary Barr; that there was no other family of Graftons in Natchez or vicinity; that her grandmother disliked Daniel Grafton; and that witness remembered well that she spoke of them as "Old Dan and Mary Barr." Laura O. Henley, cross-complainant, testifies that she is the daughter of John Barr Grafton; that her father told her that his grandfather was Daniel Grafton, and his grandmother Mary Grafton; and that he bore his grandmother's maiden name, Barr. There is also shown in evidence a copy of a deed dated March 1, 1804, to Mary Grafton, widow of the late Daniel Grafton, for lots in Natchez, Miss.; also, copy of deed from Mary Grafton, widow of the late Daniel Grafton, for the same lots. Upon this evidence we think

it is clearly shown that the brothers and sisters of William Barr, Sr., were Robert Barr, John Barr, Andrew Barr, Samuel Barr, Jane Barr Mewhirter, and Mary Barr Grafton; also, that Mary Grafton was the wife, and afterwards the widow, of Daniel Grafton, Sr., of Natchez, Miss. The answer to the objection based upon the conflicting statements of witnesses with reference to the true name, some testifying that it was Mary, or Polly, Grafton, and others that it was Sarah Grafton, is that the weight of the testimony is that it was Mary, which is corroborated by the evidence pointing to the fact that, whatever the Christian name, she married a Grafton, and that they removed to Natchez, Miss., and that Mary Grafton was the only person who answered that description. Then, as to the testimony that there were several distinct families of Barrs at an early time in every locality, both of Mississippi and Pennsylvania, in which there is any evidence or supposition that the Graftons ever lived, the rule laid down by Judge SPENCER in *Jackson* v. *Goes*, 13 Johns. 523, and cited with approval in *Jackson* v. *Cody*, 9 Cow. 150, furnishes a clear and satisfactory answer, as follows:

"Whenever plaintiff introduces a deed conveying premises to a person of the name of his lessor, it is *prima facie* evidence that the lessor is the real grantee. The burden of repelling this assumption is then on defendant, and he may prove the grant to a different person of the same name. It is not enough to prove that there was another person of the same name. He must prove that he was the person to whom the grant was made; otherwise, the plaintiff's *prima facie* case is not repelled."

To the same point, see *Pillsbury* v. *Dugan*, 9 Ohio, 120.

If this were not the rule, the difficulty of establishing the pedigree of a Smith, or Jones, or Brown, or person of any name common to many in different localities, would amount, practically, to a denial of justice.

The next question is whether the complainants are the descendants and heirs of Mary Barr Grafton. Tracing the line of descent from Daniel Grafton, Sr., and Mary Grafton, by the testimony of Thomas Grafton, grandnephew, and Mrs. Jane L. Moore, grandniece, of Laura O. Henry, cross-complainant and daughter of Jane B. Grafton and of James N. Spencer, nephew of James Grafton, who was the son of Daniel Grafton, and referring to sundry exhibits on file, we find that their children were Elizabeth and Mary, both of whom died without issue, and Daniel, Jr., who was married October 23, 1812, to Mary Flemming, and killed in 1815. One child only was born of this marriage, Thomas J. Grafton. He was married three times. By the first marriage he had one daughter, Augusta, who married James H. King, March 17, 1858. The issue of their marriage was Ella King, born December 10, 1859, and Sallie, born November 3, 1865. Ella King married James C. Love. The issue of their marriage was Marcus and Louella Love, complainants. Mrs. Love is dead, but James C. Love survives, and appears in this cause as next friend for his minor daughters. The second marriage of Thomas Grafton was to Mary E. Killingsworth. Sarah E. McClaskey, complainant, is the only issue of that marriage. She is the wife of Charles B. McClaskey. The third wife of Daniel Grafton, Jr., was Martha Hawkins, who died about 1816 without issue.

Thomas Grafton, son of Daniel Grafton, Sr., moved from Natchez to Rapides, La., about 1817. There is no testimony that he was ever married. It does appear from the testimony of Laura O. Henley that her father was John Barr Grafton, and that in conversation with him in 1865 relative to his parentage he stated that he was a grandson of Daniel Grafton and Mary B. Grafton, and that he bore his grandmother's maiden name, Barr; that his father was Thomas Grafton, a son of Daniel Grafton and of Mary Grafton, and that he resided in Rapides parish, La. Applying the rule that the law presumes that every child in a Christian country is *prima facie* the offspring of a lawful, rather than a meretricious, union of the parents; that consequently the mother, either by actual marriage or by cohabitation and recognition, was the lawful wife of the father; and that, in the absence of any negative evidence, no supplemental proof of legal marriage will be necessary to legitimize the offspring, (*Strode* v. *Magowan*, 2 Bush, 627; Lawson, Pres. Ev. 107,)—we conclude that John B. Grafton was the legitimate son of Thomas Grafton, and that Laura O. Everett, Annie Bains, Lewis Bains, Letitia Smith Bains, and Robert L. Bains, who are the children of Letitia Grafton Bains, daughter of John Barr Grafton, and cross-complainants with Laura O. Henley, are descendants of Daniel Grafton and Mary Barr Grafton. The objection that Sallie King did not authorize the filing of the petition on her behalf in the superior court of Cincinnati in this cause, and had no knowledge thereof until March, 1890, is overcome by the fact of her subsequent ratification.

We come now to the case of the cross-complainants Robert Barr, of Iowa, *et al.* These parties claim an undivided one-sixth part of the premises described in complainants' bill under the will of Robert Barr, Sr., of Westmoreland county, Pa., who is a brother of William Barr, Sr. He died, having been twice married, in 1822, without children, leaving a will dated February 16, 1821, in which he described himself as "Robert Barr, of the township of Derry, in the county of Westmoreland and state of Pennsylvania." He devised to John, Robert, and Samuel Barr, as children and heirs at law of his nephew William Barr, deceased, all and singular his real estate. There are two witnesses to this will, Samuel Morehead and Charles Beard. On the 21st day of October, 1822, before Robert Montgomery, register of Westmoreland county, came Samuel Morehead, and made oath in due form as a witness to the will, and also that he saw Charles Beard, the other witness, "who is since dead," sign as a witness thereto. A certified copy of the will, and of the probate thereof, is in evidence. It is objected, first, that it is proven by the testimony of but one witness. We think that the proof, including, as it does, the facts that Charles Beard, the other witness, was then dead, and that he signed as a witness, is a sufficient answer to this objection. Moreover, the record containing a copy of this will is a judicial record. *Holliday* v. *Ward*, 19 Pa. St. 485; *Mosier* v. *Harmon*, 29 Ohio St. 221. The jurisdiction of the officer making the record is presumed after 20 years. Greenl. Ev. § 19. The registry in which the will was probated was provided for by the constitution of Pennsylvania of 1790; and the act of 1705, then in force, provided for the proof and

record of wills by the register. *Respublica* v. *Chapman*, 1 Dall. 53, 54, which see, also, as to the sufficiency of the proof of the will. The record being more than 65 years old, and coming from the proper office properly authenticated, it is receivable in evidence as an ancient document. *Applegate* v. *Mining Co.*, 117 U. S. 255, 6 Sup. Ct. Rep. 742; *Bell* v. *Brewster*, 44 Ohio St. 690, 10 N. E. Rep. 679. Still further, if the affidavit of the surviving witness, as above stated, were insufficient, we would have no right to assume, from the fact that nothing more is disclosed by the record, that the register, upon whom no duty to record the evidence was imposed by law, had failed to take such further evidence as was necessary. The presumption is, on the other hand, that he performed his whole duty. *Comstock* v. *Crawford*, 3 Wall. 396; *Reynolds* v. *Schweinefus*, 27 Ohio St. 320. Still further, the law of Pennsylvania did not require the will to be proven by the oaths of two witnesses. *Hays* v. *Harden*, 6 Pa. St. 412; *Holliday* v. *Ward*, 19 Pa. St. 485. Where the oath of a witness cannot be obtained, it is settled that the attestation is sufficient. *Greenough* v. *Greenough*, 11 Pa. St. 498; *Loomis* v. *Kellogg*, 17 Pa. St. 60. Even if the proof of the will was defective, the act of 1856 cured it. Purd. Dig. Laws Pa. p. 509, § 13. This act is retrospective. *Broe* v. *Boyle*, 108 Pa. St. 76, and authorities there cited. To the objection that the register rendered no judgment, and that the record does not show that he pronounced the will proven, the answer is that neither was necessary. *Holliday* v. *Ward*, 19 Pa. St. 485. The register had no right to record the will until it was proven. 1 Dall. 53, 54. The fact that the register did record it is presumptive evidence that it was properly proven. *Bank* v. *Dandridge*, 12 Wheat. 70; *Lessee of Ward* v. *Barrows*, 2 Ohio St. 241.

It is objected that this will is presented without the proper evidence of its having been admitted to record by the probate court of Hamilton county, Ohio, in which county the land is situate. Section 5937 of the Revised Statutes of Ohio provides:

"Authenticated copies of wills, executed and proved according to the laws of any state or territory of the United States, relative to any property in the state of Ohio, may be admitted to record in the probate court of any county in this state where any part of such property may be situated; and such authenticated copies, so recorded, shall have the same validity in law as wills made in this state, in conformity with the laws thereof, are declared to have," etc.

Section 5942, Rev. St. Ohio, reads as follows:

"No will shall be effectual to pass real or personal estate unless it shall have been duly admitted to probate or record, as provided in this title."

These provisions have been substantially the law of Ohio since the year 1808, and it is settled that a will is not effectual to pass real estate unless it be probated if domestic, or recorded if foreign. *Wilson's Ex'rs* v. *Tappan*, 6 Ohio, 172; *Lessee of Swazey's Heirs* v. *Blackman*, 8 Ohio, 5; *Bailey* v. *Bailey*, Id. 239; *McCormick* v. *Sullivant*, 10 Wheat. 192.

It appears from a certified transcript on file that a copy of this will was probated in the probate court in and for Butler county, Ohio, on

the 26th day of May, A. D. 1886, upon its appearing to the satisfaction of said court that the original will was duly executed, proven, admitted to record, and recorded by the proper court in the state of Pennsylvania, and that it relates to property in the state of Ohio, "some part of which may be situated in this county." There is no evidence that any of the real estate which passed under the will of William Barr, Sr., is situate in Butler county. That record, therefore, seems to us not to be effectual to pass real estate in the county of Hamilton. The court-house of Hamilton county, at Cincinnati, was destroyed by riot and fire in 1884, together with a large portion of the records of the probate court, and of other courts, and of the various county offices. Subsequently an application was made in the probate court setting forth that prior to the fire a copy of the will of Robert Barr was admitted to record by Judge MATSON, then probate judge. This application was made under section 5339*b*, 81 Ohio Laws, 160, passed April 12, 1884, providing for the restoration of records in cases as therein specified. The application was denied by Judge GOEBEL. It is now claimed that the denial is *res adjudicata*, and that, the probate court having heard the evidence and denied that application, the ·cross-complainants are estopped from undertaking to prove that a record of the will was ordered by Judge MATSON prior to the destruction of the court-house by fire. We do not concur in this view. The ruling of the court was conclusive against the restoration of the record, but it does not shut out the evidence offered by the cross-complainants that prior to the fire, although there was no actual record, there was an order for the record of an authenticated copy of Robert Barr's will. It is established by the testimony of Judge MATSON, and of Sargent, one of the clerks of the probate court, that the order to admit the copy of the will to record was made by Judge MATSON, and that Sargent duly entered that order on the minutes of the court, and that the original papers have been lost or destroyed and cannot be found. These facts are not controverted. When a record has been ordered to be made, and every act has been done except the actual writing of the record, the instrument is in law considered as recorded. *Marbury v. Madison*, 1 Cranch, at page 161; *King v. Kenny*, 4 Ohio, 83. We conclude, therefore, that, although a copy of the will of Robert Barr was never in fact spread upon the records of the probate court of Hamilton county, it is, under the facts above stated, effectual to pass title to lands in Hamilton county.

Addressing ourselves to the question of fact which arises upon this branch of the case, and treating as settled what has already been found, to-wit, that the brothers of William Barr, Sr., were Robert Barr, John Barr, Andrew Barr, and Samuel Barr, and that his sisters were Jane Barr Mewhirter and Mary Barr Grafton, the objection is made that there is no testimony showing where John Barr, the brother of William Barr Sr., lived and died. Mrs. Bigelow, in her deposition given in the proceedings to perpetuate testimony, stated that she thought Samuel Barr, Andrew Barr, and John Barr, of Franklin county, Ohio, were sons of John Barr, brother of William Barr, Sr., of Pennsylvania; and that Wil-

son Lindsey, of Franklin county, Ohio, (whose conveyance was obtained by Dr. Woods, and, by his conveyance over, inured to the title of the defendants,) was a son of Mary Lindsey, who was a daughter of John Barr. Thomas Gibson Barr, who was born in 1822, in Franklin county, Ohio, deposed that he was a son of John Barr, and that his grandfather's name was John Barr; that his grandfather died in 1806 or 1807; and that at the time of his death he lived in Franklin county, Pa.

He also testifies that he had heard his father say that he had his father's will, or a copy of it. The witness also states that his mother told him afterwards that the papers which were produced, and copies thereof attached as exhibits to his deposition, were his father's papers. He testified that he had found them in his father's desk at the time of his death in 1849, and has had them in his possession ever since; that he was appointed executor, and had the settling up of his father's business. Among the documents produced is a copy of the will of John Barr, "of the township of Letterkenny, in the county of Franklin and state of Pennsylvania, farmer." This will makes provision for his son William Barr, his daughter Margaret Barr, his son Robert Barr, his daughter Mary Barr, and to his three sons Samuel, Andrew, and John, being seven children in all. Now, turning to Maria Bigelow's deposition, in answer to question 8, she gives the names and number of John Barr's children in exact accordance with the recitals in this will.

Another ancient document testified to by Thomas Gibson Barr is a release made February 20, 1810, "by and between William Barr, of Derry township, Westmoreland county, and state of Pennsylvania, of the one part, and Samuel Barr and Andrew Barr, of Letterkenny township, in Franklin county and the state aforesaid, of the other part, executors of the last will and testament of John Barr, late of Letterkenny township, in Franklin county, deceased." This recites that John Barr died possessed of divers goods, chattels, lands, and tenements situated in the county of Franklin, aforesaid, and elsewhere. Also Exhibit B, copy of release by Robert Barr, described therein as one of the sons and legatees of "John Barr, of Letterkenny township, Franklin county, Pennsylvania." So much for the documentary evidence.

Now we come to the oral testimony. In the deposition of Jane Chapman, cross-complainant, daughter of William Barr, and sister of the cross-complainants Robert and Samuel Barr, she testifies that Robert Barr was her father's uncle, but that she and her brothers and sisters called him uncle; that he died in Westmoreland county, Pa.; she cannot fix the year; states that she was young when he died; that he left his real estate by will to John, Robert, and Samuel, her brothers, and the sons of her father, William Barr. She further testifies that she knew Jane Mewhirter, sister of her greatuncle Robert Barr; that she came twice to visit him in his declining years; that he called her his sister, and that she looked like him; that Mrs. Mewhirter resided, so she thought, in Ligonier valley, and that her husband's name was William Mewhirter. She further testifies that Robert Barr made his home with her brothers John and Robert, her sister Martha, and herself. This was

after her mother remarried, from which time witness lived with her brothers and sisters.

Robert Barr, cross-complainant, of Ft. Madison, Iowa, testifies that he knew Jane Mewhirter; that he saw her in his own home in Derry township, Westmoreland county, Pa.; that he knew and waited upon his greatuncle Robert Barr during the time he lived with him and his wife; that Jane Mewhirter came there, and Robert Barr took her by the hand, and called her his sister; that she came from her home in Ligonier valley, and that she made five or six visits to her brother Robert; also that her husband's name was William Mewhirter. He testifies that Robert Barr died in September, 1822, leaving no children; that he devised his real property to John Barr, Robert Barr, and Samuel Barr, sons of William Barr, and that he was the Robert Barr mentioned in the will as a devisee.

There is also in evidence the declaration of Martha Reed, sister of Samuel Barr, and the cross-complainant. She made the following statement to Robert H. Ramsey, a witness for the defendants, who took it down in writing at the time, and produced it, and made it part of his deposition: "I am a daughter of William Barr, deceased. I know that my father's father's uncle was Robert Barr. I know that he was a brother of John Barr and Jane Mewhirter, of Ligonier valley." This is relied upon by the defendants as tending to show that Robert Barr, who made the will, was not the uncle of William Barr's children, but was the uncle of William Barr's father; but the controlling statement, in our judgment, is that Robert Barr was a brother of John Barr and Jane Mewhirter.

John Barr, of Columbus, testifies that he was born in 1815. His deposition was taken on the 25th of August, 1885. He testifies that his father resided in Franklin county, Ohio, from 1812 to the time of his death, which occurred on the 21st of March, 1853; that before 1812 his home was in Franklin county, Pa. He says that he thinks his father lived in Cumberland county, Pa., for awhile, that he was born there; and that he lived in the two counties, Cumberland and Franklin, until he came to Ohio, in 1808. He further testifies that his father resided near Shippensburg. This witness also testifies that his father, Samuel, one of the devisees in the will of John Barr, had an uncle William and an uncle Robert. He also testifies that he learned from his father that he had an uncle who went to Westmoreland county, Pa., but the witness does not remember the name. With reference to the testimony of this witness, it may be said that it appears that he was infirm, and that he had been afflicted with mental troubles, which it is claimed rendered his evidence unreliable, but there is no imputation of his integrity or truthfulness. The testimony of Robert Barr, of Iowa,—who was cross-examined at extraordinary length, something more than 500 questions having been put to him,—is assailed as unworthy of belief.

Susan McElroy, granddaughter of Jane Mewhirter, testifies that her grandmother died 51 years before the date of her deposition, which was taken February, 1885, and she always heard her say that Robert Barr,

of Derry township, was her uncle, and William Barr, father of Samuel Barr, her full cousin; that she had heard her grandmother and mother say that they visited Robert Barr. This, it is claimed, tends to prove that Robert Barr, whose will is in evidence, was not the brother of William Barr, Sr. On cross-examination Mrs. McElroy stated that her grandmother called Robert Barr uncle; that she never heard her or any of the family speak of him in any other language; and that it was because her grandmother so called him that she thought that he was her grandfather's uncle. We do not attach the importance to this portion of Mrs. McElroy's testimony that is urged for it by counsel for the defendants. It appears from the testimony of Mrs. Chapman that "Uncle Robert" was the name generally and familiarly given to Robert Barr; and there is nothing incredible, or indeed remarkable, in the supposition that even his own sister may have fallen in with the general custom. At all events, Mrs. McElroy's statement that she had no personal knowledge on the subject, and that she derived her impressions altogether from the name which she heard applied to him by her grandmother, forbids that any controlling effect should be given to that testimony. Without considering Robert Barr's evidence in detail, we may put it aside, although we do not think it altogether deserving the condemnation heaped upon it by counsel; and yet the conclusion that Robert Barr, the brother of William Barr, Sr., was the testator of the will under which the complainants claim, is, we are satisfied, clearly made out. It is urged that the exhibits attached to the deposition of Thomas Gibson Barr are not shown to have been in the proper custody, and should therefore be rejected. As already stated, Thomas Gibson Barr testified that he found those documents in his father's desk after his death, in 1849, and that he was appointed his father's executor, and settled his estate. He accounts for the papers being in his father's possession by the fact that his father was the last one at the old home; and as the others, one after another, went away, the papers were left there, and so he got them, according to his own statement to the witness. This occurred before the birth of the witness. His father was not the executor of the will of John Barr, grandfather of the witness, but Samuel and Andrew Barr, brothers of the father of the witness, were the executors; and we think that this testimony, showing that these papers were in the custody of the executors during the entire time of settling the estate, and afterwards continuously in the possession of members of the family, makes them entirely competent, under the rule that ancient documents found in the place where, and under the care of persons with whom, they might naturally and reasonably be expected to be found, or in the possession of persons having an interest in them, are in precisely the custody which gives authenticity to them. Greenl. Ev. § 142, quoting TINDAL, C. J., in *Bishop of Meath* v. *Marquess of Winchester*, 3 Bing. N. C. 183, 200, 201, and citing a long list of cases. The testimony of Jane Chapman is significant, in that it shows a special reason why Robert Barr should give his estate to the children of his brother William Barr, to-wit, that he had his home with them, and was cared for by them, in his old age, un-

til his death. The will contains provisions for every one of the children by name, and divides among them his entire estate. In our judgment, it is settled beyond dispute, both that John Barr was a resident of Franklin county, Pa., and that Robert Barr, the testator, was the brother of William Barr, Sr.

The right of these cross-complainants, together with the devisees of Jane Chapman and the descendants of Martha Reed, to one thirty-sixth part of the entire tract by reason of the fact that their ancestor, William Barr, of Westmoreland county, Pa., was one of seven children of John Barr, Sr., and that the line of Margaret Hattery, one of said children, has become extinct, depends upon the solution of questions which will arise in the discussion of the kindred claim of Robert Eldridge *et al.*, and will be considered therewith.

The case of Robert Eldridge *et al.*, cross-complainants, rests upon the proposition that they are the lineal descendants and heirs of Robert Barr, son of John Barr. Here, as in the case of the complainants and the other cross-complainants, the main contention relates to the identity of those who are among the first in the line of descent. In this branch of the case the chief disputed question is whether Robert Barr was the son of John Barr. Robert Barr, of Ft. Madison, Iowa, testifies that his uncle Robert Barr was the eldest brother of his father, William Barr, who was the son of John Barr, who was a brother of William Barr, Sr.; that he came to witness' father's home, in Derry township, Westmoreland county, Pa., when the witness was not more than four years of age; that he (Robert Barr) had his home there for two years, was married there, and afterwards removed to Stark county, Ohio, where the witness visited him, remaining two nights and a day. He then lived on a farm about one mile from Massillon, and had five children,—two sons and three daughters. Cross-complainants offer in evidence a certified copy of a patent from the United States to Robert Barr, October 2, 1812, for a quarter section of land in the district directed to be sold at Canton, the county-seat of Stark county.

The deposition of Isaac Charlton, farmer, of Wood county, Ohio, 64 years of age, is that he removed from Stark county to Wood county. He knew Robert Barr, who lived within 5 miles south-east of Massillon, and owned a farm there. Later he moved to Wood county, where he died a good many years ago. His daughter Hannah married Daniel Eldridge. They are both dead, but left an only child, Robert Eldridge, Jr., who is, from the other evidence in the case, one of the cross-complainants. We think that this testimony establishes that Robert Barr, of Wood county, was a son of John Barr, of Franklin county, Pa. The line of descent is traced by the testimony to the cross-complainants, and also to the cross-complainants Robert Barr *et al.*

It appears from the record that John Barr had seven children: Mary Barr Lindsay, Andrew Barr, Samuel Barr, and John Barr, all of Columbus, Ohio, who have conveyed their rights, title, and interest to the defendants; William Barr, of Westmoreland county, Pa.; Robert Barr, of Wood county, Ohio; and Margaret Barr Hattery. The cross-com-

plainants sue in each cross-bill for one thirty-sixth part of the entire tract, claiming that John Barr was one of the four brothers of William Barr, Sr., and that there were but two sisters, Jane Mewhirter and Mary Barr Grafton, each entitled to an undivided sixth of the estate inherited by them from Mary Jane Barr. They further claim that, from the facts appearing from the record, there arises the presumption that Margaret Hattery, daughter of John Barr, is deceased, and that she left no lineal descendants, and that therefore her one-seventh of the share of John Barr descended to the remaining descendants. Maria Bigelow, in answer to question 8 in her deposition, testifies to the marriage of Margaret Barr, whose husband's name she was not able to state, and that she had a child named Ellen. Among the ancient documents, copies of which are attached to the deposition of Thomas Gibson Barr, and the originals of which are in evidence, is a release made January 8, 1810, by Thomas Hattery, of Somerset county, Pa., and Margaret, his wife, described as "late Margaret Barr," of the one part, and Samuel Barr and Andrew Barr, of Franklin county, executors of the last will and testament of John Barr, late of Franklin county, aforesaid, deceased, reciting that: "Whereas, John Barr, by his last will and testament, made sundry bequests among his children William Barr, Margaret Hattery, late Barr, Samuel, Andrew, John, and Mary Barr; and whereas, said Margaret, since the decease of her father, has intermarried with Thomas Hattery aforesaid, they, the said Thomas Hattery and Margaret, his wife," in consideration of sundry payments received by them, grant a full release and discharge to the executors. Robert Barr, of Ft. Madison, testified in his deposition given in September, 1884, and stipulated into this cause, that his aunt Margaret was married, and had but one child, a daughter, and that he did not know what became of that child; and that she was taken away when about 15 years of age by her mother, her father being then dead; and that child when she grew up was married, and came back to the old place, and with her husband paid the family a visit. She introduced her husband as Mr. Haughey. They lived in Ligonier valley for a number of years, but had no children; that he never knew of any. She and her children, under the names of Hattery, Haughey, and Campbell,—the name which Robert Barr in his deposition gives to her husband,—were made parties defendant in the case of *Barr* v. *Chapman*, in the court of common pleas of Hamilton county, which was a suit of the same nature as this. Publication was made for them in the years 1885 and 1886. They were also made parties in this cause by the complainants, and publication made twice for them. We think a proper deduction from these facts, laying stress upon the services by publication, and the fact that there has been no response thereto, is that the line of Margaret Hattery has become extinct.

Our conclusions are as follows:

(1) That the complainants, as the descendants and heirs of John B. and Daniel Grafton, Jr., sons of Mary Barr Grafton, are entitled to two-thirds of the one-sixth part of said premises inherited by **Mary Barr Grafton**, sister of William Barr, Sr., from Mary Jane Barr.

(2) That the cross-complainants Laura O. Henley *et al.*, as descendants and heirs of Thomas Grafton, son of said Mary Barr Grafton, are entitled to one-third of the one-sixth part of said premises inherited as aforesaid by said Mary Barr Grafton.

(3) That the cross-complainants Samuel Barr *et al.* are entitled to one undivided one-sixth part of said premises under the will of Robert Barr, of Westmoreland county, Pa., brother of William Barr, Sr., and also to one thirty-sixth part thereof as descendants and heirs at law of William Barr, of Westmoreland county, Pa., son of John Barr, of Shippensburg, Pa., who was a brother of William Barr, Sr.

(4) That the cross-complainants Robert Eldridge *et al.*, as descendants and heirs of Robert Barr, of Wood county, Ohio, son of John Barr, of Shippensburg, Pa., are entitled to one thirty-sixth part of said premises.

(5) That the defendants have acquired by purchase the entire interest of the descendants of Andrew Barr and Samuel Barr, brothers of William Barr, Sr., and of Jane Barr Mewhirter, his sister, being in all three undivided one-sixth parts of said entire tract; also the entire interest of Mary Barr Lindsay, Andrew Barr, John Barr, and Samuel Barr, all of Columbus, Ohio, being four thirty-sixths of the entire tract.

(6) The defendants will be required to account for rents and profits from December 4, 1886, the date of the filing of the bill, and they will receive credit for so much of all taxes and assessments paid by them since that date as may be properly chargeable to the interests of the complainants and cross-complainants. Section 5774, Rev. St. Ohio; *West* v. *Weyer*, 46 Ohio St. 66, 18 N. E. Rep. 537.

(7) Permanent improvements made by the defendants, or by those under whom they claim, between the date of the death of Maria Bigelow, the life-tenant,—August 3, 1860,—and the date of the filing of the bill, and still remaining upon the land, will be taken into account in favor of the defendants in the partition to be made. The complainants and the cross-complainants will be excluded from all benefits therefrom. To the extent that they enhance the present value of the premises, the defendants will be allowed therefor. *Youngs* v. *Heffner*, 36 Ohio St. 232; Freem. Co-Ten. §§ 510, 511. The appraisements will be at present values.

On account of the great number of questions arising in this case, and the mass of testimony, we have found it impossible to notice fully and in detail all the points made in the elaborate briefs and arguments of counsel, and have been compelled to limit ourselves to little more than the statement of the case, and of our findings of fact and conclusions of law.

The circuit judge concurs in this opinion.